The Honorable Jerry Rodney Kilstrap, Chief Judge of the Eastern District of Texas. Welcome, Judge Kilstrap. Thank you, Judge Bowen. We have six cases on the calendar this morning from six different tribunals. One from the Claims Court, one from the Court of International Trade, one from the District Court, and three cases that will be submitted in the briefs and will not be argued from the Trademark Board, from the Patent Board, and from the Merit Systems Protection Board. Our first case is United Water Conservation District v. United States, 2023-1602. Mr. Murray. Good morning, Mayor. Please, the Court. And it's just a simple matter of housekeeping to try to keep that we've got United Water Conservation District on one side, the United States on the other. I'm going to refer to my client, United Water Conservation District, as United, as we did in the papers, the briefs, and the complaint. And the government, I'll refer to the United States as the government, to try to keep as few Uniteds flying around as possible. We are United in accepting your proposal. Thank you. So, the question before the Court in this appeal is whether United pled a physical takings claim or a regulatory takings claim. And the answer to that question is controlled by two key Supreme Court precedents. The first is Cedar Point Nursery, which is the precedent in which the Supreme Court fairly recently, within the last five years or so, described the central test of whether something is a physical taking or a regulatory taking. And what the Court said there was that it doesn't matter whether, if it's an appropriation of private property, it's a physical taking, period. It doesn't matter whether it's in the garb of a regulation or a statute. If it appropriates property, it's a physical taking. If it's merely restricting the use of the property rights holder's own property. Why isn't this premature as a regulatory taking because there was no application for a permit? If this were to be appropriately reviewed as a regulatory taking, it would be premature. We haven't disputed that. We dispute very much that the Court applied the proper framework to this. This is a physical taking because it's an appropriation, as we explained in our brief and I'll explain here today. They weren't leaving the water right in United's hands and allowing United to use the water, restricting how United used water. It was allowed to divert. They were essentially appropriating the water that United otherwise had a vested property right under California law to divert, appropriate, and put to beneficial use. And they were appropriating that and preventing us to have access to that water. And that's the second Supreme Court case that I think is really key here in controlling is the international paper case, which is really, there's no daylight between the facts in our case. I don't know. Is that true? I mean, first of all, that's a really old case, so we're not, it didn't really confront the boundary between physical takings and regulatory takings. But weren't the facts in the paper case that the water was completely diverted? Well, Your Honor, that's true. It was with the restriction on the amount of water you were entitled to use. It was a complete diversion, which fits in line with those other dam cases also, where the water was completely cut off. Aren't the facts different here in that the water wasn't completely diverted? You were just required to not take a certain amount that would enable the fish ladder to be operable. Well, it's more than just the fish ladder because, Your Honor, the water at issue was essentially meant to, for the public purpose, the United States was claiming it, the government was claiming it for the public purpose of enhancing fish migration downstream, and not just use of the ladder at the end of the day. Sure, but we don't need to quibble about what the purpose was. We agree that the United States took an action to somehow restrict your water use. I mean, they directed you to do something. You did it voluntarily. I assume they're going to talk about whether that was an actual taking or not. We'll get there when we don't. I don't know. I'm interested in talking about that with you. But to me, that kind of action seems to fall much more easily onto the regulatory side of restricting the use of your property rather than taking it away entirely, which is the paper case and the other case I'm not quite as familiar with. Yeah, I see your point, Your Honor. Well, Your Honor, that's a question of degree. And so, again, if the question is a question of degree, that often is the case with deciding whether it's a regulatory taking or a physical taking. But that's not what the Cedar Point Measurement case is. Can we talk about Casitas? Because that's our main case on point. And Casitas seemed to base its finding that the water diversion there for a very similar purpose was based on a particular set of facts, which involved the water being actually placed in the Casitas Canal and then physically diverted from that canal after it was placed there. You don't have that here, right? We don't have that here. You have upstream diversion. We have essentially an election of the use of the water at the point of diversion where the government says, we're claiming the use of this water for fish migration rather than allowing us, per our license right, to take and appropriate it. But it's not necessarily permanent. If the water flow increases so that they don't have to divert as much to continue their fish migration operations, it may be that you can get your full diversion. No, Your Honor, I don't think that's accurate. Because let me try to... Oh, is that not true? Let me just factually, hypothetically, let's just assume that drought conditions disappear, the water flow in this river increases dramatically so that you can still get your full beneficial use or whatever, I fumble around the terms, but the full amount you're entitled to and the fish migration is still completely operable. In that case, they wouldn't be diverting as much because you would be getting, or they wouldn't be lowering the amount you're entitled to. They'd still be taking as much as they needed to operate the migration, but you would be getting your full benefit. Your Honor, I don't think that's how this license works. The license essentially puts... I'm not talking about the license. I'm talking about the hypothetical fact that the water flow increases enough that both objectives can be maintained here without impinging upon either, that you'll get your full amount and the fish migration services, fish migration will have enough. I'm going to start calling it fish ladder because I think it's easier. I understand the broader thing, but the fish ladder will have enough to be operable. If that's the case, there's no taking it all, right? In that counterfactual hypothetical, absolutely, that would likely be the case. But that's, we would have the authority to prove that. Why doesn't that take it away from the scenarios in the paper cases and the dam cases where it was at least either a temporary permanent diversion or a complete permanent diversion rather than just a limitation on the amount that's diverted? Because we have alleged that we have lost water in the years at issue here and that that water was appropriated by the government due to these restrictions from our right to take it and give it to a public purpose. So we have... Counselor, isn't it a matter of possession? I mean, in the international paper case, the water was in the international paper mill. They had taken possession of it and then the government took it back. I mean, here, the water's in the river. The government's not taking possession of it. It's there in the river. It stays in the river. It's in the river. Doesn't there have to be an actual transfer or a transfer of possession? Or is possession a non-issue? Well, possession is not the issue. Really, that's part of the confusion the trial court had, I think, is that it didn't focus on the proper property right. The property right here is the right to put, to use the water to put it to beneficial use. And so to get to your international paper... How do you have a taking without a transfer of possession? Because, essentially, the government denied us access to the water. If you look at the international paper case, if you look at the Dugan case... Or look at the international paper and there's a transfer of possession to international paper and then the government takes it back. Not under the facts of the case is properly understood, Your Honor. Essentially, they cut off the water. If you look at the case, they talk about the direction was to cut off the water. So the analogy to international paper in our circumstance is that the canal, the power company's canal, is like the Santa Clara River here. That was what the paper company was drawing water into its canal, which is analogous to United's diversion canal. That was analogous to our situation. And the government said, we're cutting off the water. And I take Judge Hughes' point that that was a complete cutting off of water. But that's really a question of degree. If there's an appropriation, it's a per se physical taking. But my point is, in international paper, international paper had possession. The water was in their mill. It was in their canal. Here, the water's in the Santa Clara River. Not in the period for which they asserted the takings claim. Again, they were temporarily allowed to run out their manufacturing, their current stock. And then after that point, there were nine months where the government directive from the Secretary of War said, do not let them draw any water. So the period of issue in the actual takings claim that the Supreme Court found to be a physical taking, an appropriation of the use right, was there was no water in their canal. The power company said, you can't draw water because we have to use it all for power generation. So I think that's where the court got a little bit below, got a little bit turned around, in that it sort of accepted the promise. The issue with the court below, and what I'm a little concerned that you're not addressing, is it tried to follow our Casitas case, which is the most relevant case on point, and binds the lower court and binds us. And I don't understand how, under a fair reading, the Casitas case, yours is not a regulatory taking. Because the Casitas case was very specific that the entire reason this was a physical taking as opposed to a regulatory taking was that the water had entered into the Casitas canal and was diverted from that. And I have some problems with Casitas anyway. I'm not convinced that it's correct, but I'm bound by it. And I'm bound by the factual distinctions it made to conclude that that was a physical taking. And it relied very specifically on the fact that it entered the canal and was in the possession of the Casitas people. And it was physically removed from their possession through the bypass to the fish ladder there. You agree that this is not the situation with yours. And if that's the basis for it to be a physical taking there, you don't have it, right? That's not the basis for physical taking. But if that, I mean, do you want to look at the language of the opinion and the rehearing, the concurrence, the denial of rehearing? Because it says overtly that that's the basis for the opinions. And that was before Cedar Point clarified that there's an appropriations and appropriation period, whether it's a regulatory gloss or not. And so I think that what the court was struggling with- Are you saying that Cedar Point implicitly overruled Casitas? Well, I'm saying what we said in our briefs is that Casitas could not overrule international paper. And international paper, the appropriation of the use right- International paper is a case from what, like 1911 or 1913? It didn't even address any boundaries between regulatory takings and physical takings. There was very little regulatory state at all in 1911. We have a much healthier, robust line of precedent from the Supreme Court about what constitutes a regulatory taking that we would look to, and whether it would fall under that. And if you analyze it under that, it is a government action that limits the use of your property right. It doesn't take it away physically. But again, I'll probably- So I think the way to visualize this, Your Honor, hopefully this is helpful, is that if you look at the Freeman Diversion, the water, Santa Clara River water that hits there, is essentially the whole of it in a year is a pie. And under our license rights and under our operating conditions, the Freeman Diversion is the device by which we divide that pie and take our slice. And essentially what the government did here is say, we think your slice of the pie is too much. And so we're going to take our own knife and say, we need to cut a piece of that pie piece in half or cut it. And we're going to take that piece of the pie for the fish migration. And that's an appropriation. And again, it's not a complete appropriation of the total. We haven't alleged it's a complete appropriation. I see that I'm in my rebuttal time, so- We didn't say this one yet, did we? Ms. Humphreys. Good morning, Your Honors, and may it please the Court. I believe the Court has a complete and correct understanding of the case thus far. So if you don't mind, I'll just briefly review some of the- Well, can you address that slice of the pie argument? Because I think that's their most compelling point, is that it's not just a restriction on use. It's taking a portion of their ownership. And so if a property owner had 50 acres, and the government came in and said, we're taking 25, that's a physical taking, right? Yes. Right. And so what's the difference between that and this, where they're saying, we have a beneficial use interest, and it's in water feed or something. I'm just going to call it water. They have a beneficial use in a certain amount of water. And you're saying, no, you can only take less water. What's the difference? Your Honor, I think you touched on it. I believe United's point is that they believe they've lost the water, as if they were entitled to particular molecules of water. And once those molecules pass them by, they could never get them back. So that, in their view, is a permanent loss. But you made the point that you had- And the river is constantly gravity-fed and flowing. Therefore, just because this particular molecule passed by the canal doesn't mean that at some point, more molecules can come, and United can channel it into their system, and then divert it into their canal, and then make use of it. So in your view, the analogy there to the actual land is, you haven't taken any of their ownership, right? You've just prevented them from enjoying the benefits of that ownership right to comply with the Endangered Species Act. And it may be, under a regulatory claim, that that's a taking. But it's still a regulatory claim. Indeed. If anything, it's a restriction on use, and best analyzed under a Penn Central regulatory takings claim analysis. So I'm going to ask you a question, and you're not going to want to answer it or not. You don't have to, if you don't want to. Dio, does the government agree with Cassidus 1? I know you moved for rehearing, so apparently you had some issues with it. Let me ask it a different way. If Cassidus 1 is interpreted based upon its facts, which it's very clear in the opinion, and it's very clear, even though it's not presidential, it's very clear from the opinion concurring in the denial, that it was the specific fact that the water entered the canal, it was physically diverted from the canal, after it was in the possession of Cassidus, back to a fish... The river, it was to be taken to the river. Right. So under those facts, if that's the extent of what it can be a physical taking, that's still, I mean, I think the plaintiffs, the appellants have said, that's not the system here. Correct, that is not the system. I'm just curious if you have a view about Cassidus, because if there's other scenarios where the facts there would still lead to physical takings, claims coming out of these environmental species cases, if the diversion is not upstream like it is here, but is somehow within the private property owners' facilities. In some place other than the canal? Well, any time where the water has passed a line, I looked at the diagram in Cassidus, and it's not easy to read, but it looks to me like the water passes a line where it passes into the ownership of the Cassidus Canal, instead of just the river. And the diversion happens after that. And so any other case where you have something like that, with the water, like in this case, if the water had already been diverted into their canal, and you said, build another canal from your facility to divert it back, under Cassidus, that would be a physical taking, right? Build another canal to divert the water from the first to... So they get it, it diverts into their facility. I don't, we don't have a map of their facility.  Let's just assume it diverts into their facility somewhere. And then they're allowed to send it out. However, if you said, well, we need to somehow deal with the fish problem, and the way you should resolve it is after it's in your facility, build another, some kind of canal or something back to the river that's under your control. And then you can require them to divert certain amounts into that canal. That's the Cassidus fact. I am so sorry, and I'm not sure I'm following you because we're in milky waters. Instead of what they have now, you said, we don't like this setup. Build a setup just like in Cassidus. Oh, I see what you're saying. That's what I'm trying to say. I see, okay. I'm just trying to test, because I find the Cassidus precedent troubling, and I just don't know if there's other cases that come back. We're bound by it. Oh, indeed, and that's my answer, is we're bound by Cassidus. But I think the point you're trying to make touches upon maybe some of the language in Cassidus that spoke about the fact that the government made, it was found that the government made Cassidus build the ladder. And I think if that's what you're touching on, I apologize, Your Honor, I don't want to opine at all. I just don't want to see my name in another decision because said council said this. But that's not the case here. So we need not even worry about it. And to the extent, I don't know the exact nature of your- I guess what I'm also asking is, I'm having a hard time looking at Cassidus and trying to decide beyond anything, but just factual distinctions, how to distinguish the kind of regulatory action that was taken in Cassidus that led to a physical taking can be distinguished from regulatory actions that accomplish the same exact purpose to be only regulatory takings. I think the distinction is- And Liz, can you give me a rule to draw from Cassidus that's not just, well, it's not the facts? And if you can't, that's fine. I can't get beyond it either. But I'm a little curious what the government's position is on the dividing line that Cassidus sets out. There's not an official position, so I will opine. And I can only, simply because of the importance and weight that the courts seem to place on the canal as being a location that perhaps indicates a point of possession. And the reason that's important is because when you have a usufructory holder, water use holder, they don't possess the water. So if there's going to be- And Yolanda, you spoke to the element of possession. We've got to establish possession. So- Did I read the international paper right? I believe so. And just as an aside, please bring me back. As an aside, whether international paper is read as saying that the water was in the mill and the government made it be withdrawn or that the government prevented the water from ever entering the mill, we don't have that case here. So international paper, and indeed, Your Honor, is another case, but it has no application here because the facts as alleged do not establish either circumstance. Let me ask you a question, and I do want an answer. The June 2016 letter from the National Fisheries, the government argues that that doesn't rise to the level of a command or an order. The appellate here says, and there were five written, that it was never raised in the court below because it was not urged as the basis for an LB6 motion. So was the impact of the letter and its effect, was it raised below or was it raised for the first time on appeal? Well, the letter is core. It's fundamental here because it's the sole source of the alleged taking. So in below- And that's why I think it's an important question. Indeed. And below, we stated that the letter, if anything, wasn't a final agency action. It was just a letter. So on that basis alone, what we alleged below was sufficient to say that this isn't a proper basis for a takings claim because it's not a final agency action. We consider it to be a threshold issue worth putting up front as an argument because, as I said, it is the sole government action that supposedly brought about this taking. But what we have to- In reading just the text of the letter, and so if the court wants to stick to solely the complaint and this letter, which is incorporated by reference by the complaint. So if you just look at those two documents, the court, this court, can determine that there is no sufficient- The facts alleged don't establish a plausible takings claim. And that's because the letter, for example, changed no legal obligation of- I'm a little confused by this argument. And let me see if I can kind of tease out what I hope you're arguing and what I hope you're not arguing. Because the government sees this as a regulatory taking. Correct. So your view clearly would be this can't be the source of a regulatory taking claim because there's no final agency action. Yes, yes, yes, yes. And they agree with that. Yes. But if this was properly characterized as a physical taking, let's just assume this now. I know you disagree. Why wouldn't this letter be sufficient to constitute agency action that led to a physical taking? A physical taking would require some sort of physical invasion. The hypothetical assumes that the action taken in response to this letter results in a physical taking. I don't want to debate whether it's a taking or not now. I want to debate whether this letter can form the basis for a physical taking. Because it seems to me your view in the brief was that it couldn't because it wasn't a final agency order and it was just a recommendation for what they should do. I get it if it's regulatory, that's not enough. They can see that. But if it actually was a physical taking, why wasn't a letter from the government saying do this, or we're going to sue you under the Environmental Species Act sufficient to constitute a physical taking, to constitute sufficient agency action to be a taking? I hope I'm answering where I set you. But it's because it required no ouster, no seizure. No, no, no, no. It did require an ouster. I don't want to, again, I'm not debating the merits of the taking claim. I'm trying to figure out if you think this letter in a physical takings context would constitute sufficient agency action to base a takings claim on. I'll just put my cards on the table. I don't see why you would ever argue that it's not because you want parties to voluntarily comply with enforcement orders even if they lead to a takings claim, don't you? If you say this endangers fish, you should do this. You're allowed to do that even if you're going to compensate them because it's taking their property. So you shouldn't want them to have to wait and undergo an enforcement action before it can constitute a takings claim. That's what I'm trying to get at. So assuming it's a takings, an actual physical takings, is the government's position that this letter nonetheless can't be the action that supports the takings claim? I'm not going to hold you. I'm asking this as a hypothetical. I'm not going to argue with it. I was a government attorney. I know how hard it is to answer these hypotheticals. But as a policy matter, it can't be the case that this kind of letter, which is not just, oh, you might think about doing this. It's pretty strong and do this because or we'll sue you. That that's an agency action that if they comply with it and it meets the grounds for physical taking it, that's all they need, right? Your Honor, I am so sorry, but the reason I am so reluctant to just go ahead and agree with you is simply because I can't, I don't read that letter as being a mandate. Okay, then let's add that to the hypothetical. The letter says take this action or we'll sue you. Is that enough? You don't have to wait until they get sued and the agency says, yes, do this, right? Let me make it simple. A voluntary action, I think there's plenty of precedent on this, so I don't think you're giving up much. A voluntary action in response to a government demand that's accompanied by a threat of civil or even criminal enforcement is a sufficient agency action that can constitute a taking. Is it not? I believe so. Okay, I'm not going to put that in. Then don't you dare, please. I hope they don't. Let me ask a hypothetical because I don't get to ask many hypotheticals. You've got a taxpayer and they've got a bank account and there's $100,000 in the bank account. The IRS says this taxpayer owes us money. In one situation, the bank puts a hold on the money. It stays in the account, but the account holder can't access it. Their checks bounce, their withdrawals are refused, the money never leaves the bank, but it stays in the bank account of the taxpayer. In another scenario, the IRS says, give me the $100,000 and the bank actually takes it out of the taxpayer's account and delivers it to the IRS. Is one a regulatory taking and one a physical taking? Are they both the same type taking? How do you know? Because money's fungible just like water's fungible. It's not that I have an interest in this dollar bill or I have an interest in this molecule of water. It's money, it's water. In one case, it stays in the bank. In one case, it's taken out of the bank. Is that a fair analogy here? The circumstance in which one is dispossessed of something one owned, that would be akin to a physical taking. But if it's just a restriction on use, meaning if, for example, the example with the- I'm just a hollow bone, I can't get it. Right. I can't get it. Right. I'm just as bold one way as I am the other. You're limited on your use. There's a restriction, there's an interference with. There's a limitation on your use, which would be more of the regulatory. For some reason, this is hearkening back to, I think it's Horne, in which the court indicated that the consequence of a government action may be the same, that the owner doesn't have the thing. But the court emphasized that it's the means, not just the end, that the court has to look at. So the question I, as I, the hypothetical I think you're posing is trying to look at the means that gets to the point where a claimant can say, but I don't have it in my hand. And so- Counsel, your time has expired and it- Can I just ask her one more question? Well, it's the, one more question. And then I'd like to ask her, since she hasn't really had a chance to state her case, to give us a brief summary of your position. Okay. And if regulation, even if it doesn't physically take the property, deprives the property owner of all economic use, then that's something that's analyzed under the regulatory takings framework and can still result in compensation, right? Yes, yes. Do you want to give us a brief summary of your position? I can. I can close with two points. Thank you, Your Honor, for the ability. It's simply that the facts alleged in the complaint do not establish that NIPS, by way of its 2016 correspondence, either commandeered or ousted or regulated any water in which United had a possessory ownership interest at this time of the taking. And two, the facts alleged fail to show that United no longer possesses its water right or any portion of its water right, as it alleges in its reply brief. And for that reason, this court should affirm. Thank you so much. Thank you, Ms. Rankin. Mr. Murray, you can take five minutes if you need it. Okay, thank you, Your Honor. I appreciate that. All right. I just want to address a few points on rebuttal. And again... Can I get back to your pie analogy? Absolutely. I was planning to get there, Your Honor. Well, because I think, I mean, it's instructive, but I'm not sure it helps you that much. Because if you compare it to the real property analogy, they haven't permanently taken your ownership rights in this water, right? You still have them. Again, if the water flow increased in a level that can accommodate your entire ownership rights and the fish platter, then it would be increased. Your Honor, in that case, we wouldn't be able to prove an appropriation. But still, as the facility operates... You wouldn't be able to allege anything because nothing would be taken. No, we would, Your Honor, because our license provides us the authority to divert under certain seasonal flows in certain cubic feet of water. And they basically compress that to say you can't draw under certain seasonal flow... They actually haven't taken part of your license. They put a limitation on the use. But the license, again, the water... I also want to disabuse, I think... Let me go back to the property analogy. If somebody has 50 acres and the government comes in and says, we're taking 25 of these acres to build a dam, that's no doubt a physical taking. Sure, yeah, absolutely. If they say, this is a wetland that has some kind of unique species in it and you can't develop it because it will endanger this species habitat, but you nonetheless retain an ownership right. What is that? That's a regulatory taking. Right. But again, I think, Your Honor... Because one, they take away the property and the second, they put a limitation on the use of the property. Your Honor, it's important to understand, though, the license right that conveys the vested property right under California law entitles United to withdraw a certain amount of water under certain conditions up to a certain number of acre-feet per year. And so this is, again, where I get to this issue of whether the law is... They're not taking away that license or changing it. They're limiting the amount you can draw. And if that changes, you can get it back. Again, they are limiting... And we've arisen the complaint and the facts as they stand before this Court are that we lost 50,000 acre-feet of water because we would have been able to operate and withdraw more water than we were allowed to under this restriction, this enforcement that Your Honor properly characterized as such. And that that was essentially cutting our piece of the pie, cutting a slice off and taking it back. And again, the key distinction as laid out in Senior Plain, we had the block quote from page 30 of our brief, our opening brief, is that a regulatory taking is a restriction on your use of your own property. Once they cut off that piece of our pie slice and said, you got too much pie, I want that part of the pie for fish ladder, fish migration, we no longer have any ability to use that piece that they've taken. That is what we have here. That's why it's a physical taking because they've appropriated that. And there's a same... But the ability to use is not the same as diversion of possession or an ouster. I mean, ability to use is the wetland you can't build on. It's not taking the 25 acres for the dam. In a real property situation, you're absolutely right, Your Honor. But that's what's so odd. And I think that's why these water cases can be confusing and cause some confusion about the regulatory versus physical taking. Because the right is a use of property right. The property right itself is the right to use the water. And possession is certainly incident to that. You can't use water you can't possess. But we have a vested property right. And there's really been no dispute on the facts before you that we have a vested property right to divert additional water that we were not allowed to divert under this restriction. And that was essentially the same as international paper of shutting off that amount of water. And the Supreme Court has held multiple times and that cutting off that water... Can I go back to any cases from our court where this kind of upstream water diversion has been termed physical taking? The only physical taking case I see from our court involving water rights is Casitas. And you seem to be wanting to run away from that case as fast as you can. No, Your Honor. Again, I want to be clear. Casitas says it's a physical taking. And I think the key point is Casitas didn't and couldn't with international paper say that it has to be in the canal first. It certainly cited that as a factor. And we've tried to reconcile that as part of, you know, that you can say it's an additional factor but it's not a requirement. It's not a prerequisite. And, you know, I know it's an old case that the Casitas cited it. The court below cited it. So again, there's recognition that it's a case that still has efficacy. And again, you know, unless the water that's not diverted is considered to be our property, then there's not a restriction on our use of our property. It's essentially the appropriation, the confiscation, the reallocation of that water that we had a right to use. Do you have a final thought, counsel? Just, Your Honor, that I think, again, there's a lot of confusion in the ESA space because it's a regulation. And I think Cedar Point really is a very key consideration for this court to have and recognize that you have to look at whether what happened here was they appropriated water that we otherwise had a right to or they just limited our ability to use water that we never got in the first place. And that's a key distinction. The court should be reversed, Your Honor. Thank you. Thank you, counsel. We appreciate both arguments and the cases submitted.